UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**PHILIP A. ROMANO,**                                    Chapter 7
        Debtor                                          Case No. 04-11263-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**CASELLA WASTE MANAGEMENT
OF MASSACHUSETTS, INC. and
CASELLA WASTE MANAGEMENT, INC.,**
        Plaintiffs

v.                                                      Adv. P. No. 04-1170

**PHILIP A. ROMANO,**
        Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

        The matter before the Court is the Complaint filed by Casella Waste Management

of Massachusetts, Inc. and Casella Waste Management, Inc. (collectively, "Casella") against

the debtor, Philip A. Romano (the "Debtor"). Pursuant to 11 U.S.C. § 523(a)(2)(A) and (B),

(a)(4) and (a)(6), Casella seeks to except from discharge certain obligations arising out of

an Asset Purchase and Assignment Agreement with Allstate Carting, Inc. ("Allstate"), a

corporation owned by the Debtor and Kevin J. Farley ("Farley") as fifty-percent

shareholders.  In particular, Casella contends, among other things, that the Debtor

converted accounts receivable that it purchased from Allstate, a waste hauling business

1

founded by Romano in the late 1990's.

The Debtor answered the Complaint and filed a Counterclaim against Casella. Casella also sought leave to file a Cross-Claim against Farley, who had filed, individually, and as a fifty-percent shareholder of Allstate, a Complaint against Romano and a nearly identical Complaint against Romano's spouse, Dianne M. Romano, a debtor in Case No. 05-16880-RS. The Court consolidated those two adversary proceedings (Adv. P. No. 04-1129 and Adv. P. No. 05-1546) for trial. The Court conducted a three-day trial in the consolidated adversary proceedings, and, on October 30, 2006, entered judgment in favor of Allstate and against Romano and Dianne M. Romano for embezzlement with respect to excessive compensation they obtained from Allstate. The Court also entered judgment in favor of the Romanos and against Farley with respect to Farley's remaining claims against them under 11 U.S.C. § 523(a)(2)(A) and (4).[1] See Farley v. Romano (In re Romano), 353 B.R. 738 (Bankr. D. Mass. 2006). Trial of the present Complaint is the final chapter in the parties' on-going disputes arising out of the sale of Allstate's assets to Casella.

Beginning on September 18, 2007, the Court conducted a three-day trial in the above-captioned adversary proceeding at which three witnesses testified and nineteen exhibits were introduced into evidence. During the course of the trial, the Court dismissed the Debtor's Counterclaim against Casella for lack of standing, ruling that any causes of action which the Debtor might have against Casella were property of his bankruptcy estate and that the Chapter 7 Trustee was the proper party to bring such causes of action. See 11

---

[1] Farley waived his claim under 11 U.S.C. § 523(a)(6) during the trial.

2

U.S.C. §§ 323(a) and(b), and 541(a).  Additionally, the Court denied Casella's Motion to

Assert a Cross-claim against Farley for lack of jurisdiction.[2]

Following the trial, the parties filed briefs.  The Court now makes its findings of fact

and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

As mentioned above, three witnesses testified at trial: Brian Van Dam ("Van Dam"),

the Controller for Casella's Northeast Region, as well as Farley and Romano.  Romano

founded Allstate in the late 1990's and operated it until 2001 when he was introduced to

Farley, a self-employed certified public account. Romano and Farley subsequently entered

into an agreement pursuant to which Farley was to provide Allstate with financial

assistance.  In May of 2002, Farley became a shareholder of Allstate and assumed the title

of Controller.

Each witness had a different version of events leading up to and following the sale

of Allstate's assets to Casella, although the testimony of Van Dam and Farley coincided on

key points, as will be discussed below.  Nevertheless, at the outset, the Court is compelled

to observe that each witness had their own particular point of view and bias.  As the

_____

[2] The Chapter 7 Trustee filed a "Statement with respect to Plaintiff Casella's Proposed Cross-Claim against Farley" in which she stated "[t]he determination of liability, if any, of Farley to Casello [sic] has no affect on the administration of the estate if the case is a no asset case." Although the Trustee withdrew her Report of No Distribution, it is unclear what assets the Trustee has been able to administer and whether there will be a meaningful dividend to creditors such as Casella who filed a proof of claim in the Debtor's case in the sum $119,219.40. Moreover, Farley, who had originally assented to the assertion of a Cross-Claim against him by Casella later objected, highlighting the procedural deficiencies affecting Casella's Motion.

3

individual primarily responsible for Casella's due diligence leading up to the purchase of

Allstate's assets, Van Dam testified that both Romano and Farley agreed to the terms of the

asset sale, particularly those involving Casella's commitment to purchase Allstate's

accounts receivable and that both agreed to the terms of certain unwritten agreements

pertaining to a $25,000 hold back relating to the purchase price of the accounts receivable

and Casella's acquisition of post-June 1, 2003 receivables in exchange for Allstate's use of

its dump sites. Farley and Romano, as former shareholders and disaffected partners in

Allstate, tended to blame each other for Casella's assertion of claims against them arising

out of the Asset Purchase and Assignment Agreement. Their testimony was contradictory.

At the outset, the Court finds that Romano's attempts to portray himself as ignorant

with respect to ordinary and customary business practices was unconvincing and belied

by his experience operating Allstate. Although Romano had neither the time nor the

inclination to manage Allstate's business records, in particular its computerized records,

he understood cash flow, invoicing, and, most importantly, accounts receivable. His

assertions that he did not know what accounts receivable are were unconvincing. Romano

is unsophisticated, but he does not lack business savvy. He certainly is not as obtuse as he

pretended to be as a witness.

This Court outlined the business relationship between Farley and Romano in its

2006 decision pertaining to Farley's claims against Romano. *See generally* In re Romano, 353

B.R. at 745. Following his initial consultative work for Allstate, Farley became a

shareholder of Allstate in the late Spring of 2002, and he and Romano shared

4

responsibilities for the company's operations. Romano concentrated on sales and marketing, as well as trash collection and dumping, supervision of Allstate's drivers, and maintenance of its fleet of trucks and equipment. Prior to engaging Farley, Romano had operated Allstate out of his service truck, and his wife, Dianne, kept the books with the assistance of an employee, Maureen Curtin, who answered the phone and performed other office tasks. The couple paid themselves a salary and also used checks drawn on Allstate's bank accounts to pay their personal obligations. In 2003, they withdrew substantial sums of money from Allstate in addition to salary.

At the time Farley became involved in Allstate's business, the company was struggling. In order to finance and expand the business, Romano, at the insistence of lenders, was required to personally guaranty loans made to Allstate, including loans for the acquisition of trucks and other equipment. Because Allstate had been unable to collect a sizeable receivable from one of its customers, it had suffered a setback and Romano had to obtain a mortgage on his home located at 38 Craneneck Street in West Newbury, the proceeds of which he invested in Allstate. Additionally, Allstate had cash flow problems, had trouble paying its bills, and had a history of bouncing checks, problems which did not deter Romano from drawing a salary, which took the form of checks made payable to Dianne Romano. Allstate's financial problems were exacerbated by Romano's practice of using business funds for personal and family obligations and sloppy record keeping. Farley was to be responsible for rectifying Allstate's record-keeping problems, although, according to Romano, he acquiesced in couple's continued use of the corporate account to

5

satisfy their personal obligations in addition to the salary Romano paid Dianne.

Farley's primary responsibilities were to keep Allstate's computer records up-to-date, invoice customers and procure financing. Romano, however, continued to collect checks, either directly from customers or from Allstate's post office box, sometimes with the assistance of Maureen Curtin or Matt Evangelista ("Evangelista"), an intermittent employee of Allstate and business associate of Romano. Notably, following the sale of Allstate's assets to Casella, Evangelista was Romano's nominal employer as the owner of Liberty Site Development & Demolition, LLC ("Liberty Site"), a company which Evangelista formed around the time of the sale to Casella and in which Romano was a silent partner.

The business arrangement between Farley and Romano did not proceed smoothly. Romano complained that Farley did not show up for work and did not make his full contribution under their shareholder agreement. During tax season, Farley was preoccupied with running his own business. Although Farley testified that he traveled from his home in Wolfeboro, New Hampshire to Allstate's business office in Ipswich, Massachusetts at least one or two days per week, the Court finds that his testimony on this score was less than credible as Van Dam testified about his frustration in communicating with Farley, who failed to return telephone calls and failed to promptly respond to requests for information pertaining to the sale of Allstate's assets to Casella.

In late 2002, Romano and Farley decided to sell Allstate. Romano testified that he told people he was selling because, in his words, he "couldn't stand Kevin [Farley] in a nice

6

way" and because he was "burnt out." In early 2003, Farley and Romano began

negotiations with Casella through its representative, Cheryl Coletti ("Coletti"). On March

22, 2003, Coletti, in her capacity as a Business Development Associate for Casella, and

Farley executed a Confidentiality Agreement. Farley executed the document as Allstate's

vice-president, although he did not formally hold that title.

Coletti requested Farley to complete an "Acquisition Evaluation Checklist" pursuant

to which Casella sought information about Allstate's routes by line of business,[3] its fixed

assets, the number of containers it used by type, the number of employees on its payroll,

including rates of pay, positions and dates of hire, the status of its properties, including

location and monthly lease payments, and the "disposal tons by line of business."

Additionally, Casella sought copies of Allstate's contracts, profit and loss statements for

the last two years, the number of customers by line of business, revenue by line of business,

and a customer list with payment rates. Farley partially completed the form, with

Romano's assistance, but advised Coletti that he was waiting for additional information

with respect to contracts, disposal tons by line of business, and customer lists with rates.

Notably, he attached "a copy of our comparative financial statements for the year ending

December 31, 2002," adding that "this is also the most current *accurate* balance sheet."

(emphasis supplied). The balance sheet for the periods ending December 31, 2002 and

---

[3] The lines of business were categorized by whether the trucks servicing
customers were "roll off" or "rear loaded."

2001,[1] to which the accountant's notes were not attached, showed the following:

| Assets | 2002 | 2001 |
|---|---|---|
| Cash | $ 11,491.00 | $ 13,601.97 |
| Accounts Receivable | 152,168.52 | 176,024.23 |
| Prepaid Expenses | 23,512.36 | -0- |
| | | |
| Property and Equipment | 1,059,733.12 | 847,104.04 |
| Less accumulated depreciation | (549,190.21) | (348,847.00) |
| | 510,582.91 | 498,257.04 |
| Other Assets | | |
| Investment in subsidiary | 40,000.00 | -0- |
| Other long term investments | -0- | 2,145.00 |
| | | |
| Total Assets | $737,754.79 | $690,028.24 |
| | | |
| Current Liabilities | | |
| Accounts Payable - trade | $ 473,965.84 | $ 177,897.45 |
| Other accrued liabilities | -0- | 887.50 |
| Withheld/accrued payroll taxes | 110,000.64 | 6,686.50 |
| | 583,966.48 | 215,471.45 |
| Long Term Liabilities | | |
| Capital lease obligations | 166,190.09 | 230,905.30 |
| Notes payable | 268,413.08 | 261,553.31 |
| Other long term liabilities | 114,648.58 | -0- |
| | | |
| Total Liabilities | $1,133,218.23 | $ 707,930.06 |
| | | |
| Stockholders' Equity | | |
| Common stock issued | 4,165.00 | 4,165.00 |
| Additional paid-in capital | -0- | 198,270.31 |
| Retained earnings | (399,628.44) | (220,337.13) |

Coletti responded to the information Farley provided with a request for additional

information. In a letter dated March 31, 2003, Farley provided Coletti, and by extension

---

[1] Although the balance sheets were attached to Plaintiff's Exhibit 12, a letter from
Farley to Coletti dated March 31, 2003, Farley referenced them in his earlier letter dated
March 25, 2003.

Casella, with a list of customers by location, size and pricing; a representation that Allstate

was a tenant at will at the locations from which it operated; a description of Allstate's

vehicles; and a list of containers.

Farley again wrote to Coletti on April 28, 2003. Apparently, she had questions about

the financial information provided to her by Farley. As a result of a telephone

conversation, Farley advised Coletti that he had restated the earnings for the tax year 2002

by removing "those unrelated business expenses incurred in 2002," namely "depreciation,

rent, utilities, legal and accounting, corporate overhead insurance, outside sales costs,

advertising, and communications expenses associated with corporate overhead." Thus,

according to Farley, Allstate reported a gross profit of $366,765; had operating expenses of

$490,566 which he reduced by $331,000 to account for the items set forth above to obtain

adjusted operating expenses of $159,566, resulting in earnings before interest and taxes of

$207,199. Farley added that after speaking with Romano, Allstate's fixed assets had an

estimated wholesale value of $600,000. He concluded "[u]sing the quick formula of three

times net annual cash flow plus value of assets, I arrive at an estimated valuation of

Allstate Carting of $1,200,000." Farley also noted that the parties needed to discuss the

treatment of accounts receivable.

On April 30, 2003, Farley again wrote to Coletti outlining the "the deal as I know it."

Noting that gray areas still existed, he stated:

> Sale of business fixed assets, contracts, rolling stock, waste containers for
> $950,000[.]
>
> Purchase of trade accounts receivable as follows: less than 30 days aging

> 100% of value, 30 to 60 days aging 75% of value, over 60 days aging no value.
> This will pertain to assumed customer base only. I want to point out that we
> will bill in advance. So that a bill dated April 1 is for service during the
> month of April. Therefore, the actual aging will not start until May 1. . . .

On May 1, 2003, Farley prepared an Accounts Receivable Aging Summary. He reported

total accounts receivable of $197,746.52 broken down as follows: Current - - $35,521.37; 1-

30 days - - $40,677.83; 31-60 days - - $23,984.76; 60-90 days - - $31,108.17; and over 90 days -

- $63,454.39.

Apparently satisfied with the information it had received, Casella and "Allstate,

LLC" executed a Letter of Intent on May 8, 2003. Farley executed the agreement on behalf

of Allstate as "Owner," and Jim Hiltner, in his capacity as Eastern Regional Vice-President,

executed it on behalf of Casella. Pursuant to the Letter of Intent, Casella obtained the right

to conduct due diligence through June 6, 2003. The parties also agreed to execute, on or

before June 13, 2003, an Asset Purchase and Assignment Agreement "with the intention to

close the Allstate/CWM of MA acquisition on or before June 30, 2003." Allstate was

required to operate its business in the ordinary course until the date of the closing, and it

agreed to provide Casella with "full access to Seller's books, records, assets and employees

in order for CWM of MA to complete its review with respect to this transaction. Casella

offered $900,000 for Allstate's assets, except cash and prepaid insurance, free and clear of

all encumbrances. The Letter of Intent at paragraph 4 set forth the parties' understanding

about Allstate's accounts receivable. It provided the following:

> At Closing, Allstate shall sell to CWM of MA and CWM of MA shall
> purchase the trade receivables of Allstate that are in arrears for an amount
> that is calculated as follows: (a) 100% for any receivables under 30 days old,

10

(b) 75% for receivables over 30 days old but under 60 days, and (c) zero for
receivables over 60 days older.  At Closing, Allstate shall sell to CWM of MA
and CWM of MA shall purchase the trade receivables of Allstate that are
advanced billed for an amount that is calculated as follows: (a) zero for any
receivables where the customer has been billed and the receivable is reflected
in the aging but no services have been provided, (b) 100% for any receivables
under 60 days old, (b) [sic] 75% for receivables over 60 days old but under 90
days, and (c) zero for receivables over 90 days old.  This is in principle and
an exact figure will be determined prior to closing after conducting a detailed
review of the accounts receivable aging and will exclude accounts currently
in collection.

Van Dam testified that, although Allstate's financial statements showed that it was not
liquid, the company was "marginally profitable," and a good fit for Casella because
Allstate's "routes were very close in proximity to routes that we [Casella] were already
running in our Peabody and Salem, New Hampshire operations" - - a circumstance that
would allow Casella to "densify the existing routes."  Moreover, from his meetings with
Romano, Van Dam observed the following:

> It was clear that he [Romano] was well-versed in the equipment.  He knew
> all his customers.  He was their one and only salesman, so he had built the
> business from the ground up, so I walked away feeling that he was, although
> maybe not the most sophisticated, clearly sophisticated enough to start,
> develop, and run his own business.

Van Dam, who admitted that "the trial really surrounds the accounts receivable," testified
that he reviewed the May 1, 2003 Accounts Receivable Aging Summary prepared by Farley
to ascertain "whether the aging gave any credence to their [Allstate's] sales volume based
on the day sales outstanding, and to get a feel for what the potential cost of the
receivable[s] would be."  He indicated, however, that it was insufficient to make an actual
evaluation because it lacked detail.  He stated that in order to make an appropriate

11

evaluation of Allstate's accounts receivable he needed a detailed listing of customers, invoice by invoice, with dates of service so that Casella value the receivables and assess its ability to collect against them.

Van Dam, in testifying about the events leading up to the execution of the Asset Purchase and Assignment Agreement, stated that Casella had selected June 1, 2003 for the closing date, although the Letter of Intent, which he drafted, referenced a date on or before June 13, 2003. He indicated that the closing was "delayed due to some last minute claims that had been [sic] surfaced against the assets of Allstate," adding that Casella could not determine, based upon the information provided by Farley, what it was going to pay for the accounts receivable asset. He explained:

> I spoke on a number of occasions to Mr. Farley. I wasn't really getting anywhere with Mr. Farley. I called Mr. Romano. And the three of us agreed that they would come down to my office in Holliston and that we would go through their receivables, arrive at a number that we were going to pay, and they would provide all the detail as of June 1 so that we could do what we needed to do to close.

Romano and Van Dam agreed to a meeting because of Farley's recalcitrance in returning Van Dam's phone calls. According to Van Dam, a meeting was needed "to arrive at the detailed accounts receivable list that we [Casella] would purchase under the defined percentages for the business." Van Dam testified that he explained to Romano what Casella needed so that it could "arrive at a total number that we would pay them [sic] for the receivables we were purchasing as of June 1." Van Dam further testified that he got the impression that Romano understood what Casella was looking to obtain because he was able to convey to Farley what was required, adding that "they came down with what we

12

needed." He added: " He [Romano] understood his receivables, he had been collecting

them right along . . . ."

On June 18, 2003, Van Dam, Farley and Romano met at Van Dam's office in

Holliston and spent approximately five hours producing an accounts receivable aging.

Farley and Romano arrived with a document captioned, "Allstate Carting, Inc. Open

Invoices as of June 18, 2003," which, after review by Farley and Romano, formed the basis

of Casella's offer for the receivables, together with a box of invoices used to generate the

accounts receivable list requested by Van Dam. Farley worked on his lap top, while

Romano offered information about the accounts. Van Dam stated that all the receivables

on the list were pre-June $1^{st}$ receivables and that some of the post-June $1^{st}$ receivables had

not been billed yet.

From the information provided at the meeting, Van Dam produced a document

which reflected Casella's valuation of the accounts receivable. According to that document,

Allstate's receivables totaled $182,324.24, and Casella was willing to pay $111,039.77 for

them, less a $25,000 hold back, which Romano suggested at some point should be larger.

The $25,000 hold back was the subject of an oral agreement. Neither Romano nor Farley,

however, challenged the validity or enforceability of that agreement. According to Van

Dam, Casella did not purchase the receivables owed to Allstate after June 1, 2003, for which

Allstate billed in advance, because those receivables, which he estimated totaled

approximately $60-70,000, were to be billed separately by Casella. Van Dam opined that

if he knew the disposal costs for Allstate, he could estimate the number of tons that a

hauler has on their trucks, because "that really is where the value of the hauling company

is derived." It also served as a "double check" for the revenue numbers being provided

by Farley and Romano.

Romano's recollection of events and his conduct at the meeting differed from that

of Van Dam. Romano denied having a conversation with Farley about the accounts

receivable aging and the discounts Van Dam, on behalf of Casella, intended to apply to

each so-called "bucket" based upon the age of the receivables. At one point, Romano

stated that he never understood how Casella was valuing the accounts receivable, not even

at the closing. He even stated that he did not understand that the accounts receivable were

being sold. He denied seeing the May 1, 2003 accounts receivable summary prepared by

Farley, and he testified that he did not know the purpose of the meeting in Holliston with

Van Dam, other than "to get Kevin Farley and his computer and all our stuff together."

Romano also indicated that he had no idea what Farley was putting together with Van

Dam because at the time of the meeting he was in the garage at Holliston where he

encountered some of his buddies and later had a meeting with a Casella executive, John

Volpe ("Volpe"), with whom he discussed a sales position with Casella. Nevertheless,

Romano recalled Van Dam stating "'How the hell did you run a business like that?'" when

he saw the big box of invoices Farley and Romano brought to the meeting.

Farley testified to the contrary. He stated that "[w]e spent . . . hours going over our

customer list, cleaning it up, making sure that the accounts receivables were correct."

Farley added that he took the accounts receivable aging off the Quickbooks application on

14

his laptop computer, adding "because it was not up to date, I would have needed Phil to

go over with me each of the accounts and say, 'Okay, well, which one - - which one of these

accounts have you been paid on?' We would have cleaned up that accounts receivable, you

know, and removed invoices that had, in fact, been paid." Farley testified that Romano

was the source of information about whether accounts receivables were paid for the entire

June 18th list. Farley also testified that Allstate was no  longer operating on June 18th,

stating "we didn't have any trucks, we didn't have any payroll, we didn't have any dumps.

So at that point effectively our - - our bills had been shut off already. We didn't have any

bills."

Eight days after the Holliston meeting, Casella and Allstate executed the Asset

Purchase and Assignment Agreement. Additionally, Farley and Romano executed non-

competition agreements, and Romano executed a Consultation Agreement pursuant to

which Casella agreed to compensate him at the rate of $8,000 per month and to provide

him with an automobile allowance of $450 per month, as well as medical and dental

insurance. The term of the Consultation Agreement was for the period between the closing

and August 29, 2003.

With respect to the Asset Purchase and Assignment Agreement, paragraph 1.1 of

provided the following:

> Effective 5:00 p.m. on June 1, 2003 (the "Effective Date") Seller agrees to sell,
> transfer, assign and convey, free and clear of all liens and Buyer agrees to
> buy, all of Seller's right, title and interest in and to the Acquired Assets, both
> tangible and intangible, used in the Business now and on the Effective Date,
> except the excluded items set forth in Section 1.2. . . .

15

Paragraph 4.2 of the Agreement provided that the closing would take place on June 9, 2003, although, in fact, it occurred over two weeks later.

The parties agreed that the purchase price for the Acquired Assets was $900,000 and included in the sale "[a]ll of the operating assets used or useful in the Business," including containers, trucks, machinery and equipment; good will, including the trade name and logos; Allstate's telephone numbers; customer data, contracts and accounts receivable. The purchase price for the accounts receivable was $111,039.77, subject to the $25,000 hold back which would be payable at the end of 45 days when Casella would "true up" the $25,000 and pay Allstate whatever was remaining.

In paragraph 5.1.10 of Section 5, "Representations and Warranties," Allstate represented that it was not insolvent and that the consummation of the transaction contemplated would not render it insolvent." Section 6 of the Agreement outlined Allstate's obligations pending the closing. In addition to maintaining insurance, Allstate agreed, retroactively, "not to grant or permit to exist any lien on or with respect to the Assets except those listed on Schedule 5.1.6". . . and [to]"operate Seller's business as in the past including, without limitation, maintaining adequate inventory." Finally, the parties agreed that the Agreement represented "the entire understanding of the parties with respect to its subject matter, and supersedes all prior agreements, written or oral, concerning the subject matter hereof. . . ." In addition, as will be discussed further below, the parties entered into an Escrow Agreement for the payment of creditors with valid liens against the assets Casella was acquiring. Allstate's attorney, Mark L. Janos, was designated

16

the Escrow Agent.  Schedule M attached to the Agreement identified the holders of liens together with UCC identification numbers, and so-called "non-UCC Commitments" to other creditors.  The list did not include the perfected security interest Romano obtained against all of Allstate's assets on June 13, 2003.

The timing and terms of the Asset Purchase and Assignment Agreement, particularly the paragraphs reproduced above, proved to be troublesome for all parties. In the first place, Allstate either was within the zone of insolvency or insolvent at the time it executed the Asset Purchase and Assignment Agreement.  Indeed, Farley admitted to writing a letter to a dump site owner identified as Wheelabrator prior to the June 26, 2003 closing in which he represented that Allstate, in fact, was insolvent.  In May and June of 2003, Allstate's ability to transact business was compromised because dump sites it routinely used refused to accept trash because of bounced checks or other forms of nonpayment.

Faced with an inability to dump the trash that Allstate was continuing to pick up, Farley and Volpe, a district vice-president of Casella, executed a Disposal Service Agreement on June 2, 2003 pursuant to which Casella agreed to provide Allstate with "non-hazardous solid waste disposal services at the solid waste resource recovery facility located in Ward Hill Neck, Haverhill, MA" in exchange for the payment of fees in the amount of $80 per ton of waste disposed.  Casella and Allstate did not abide by the terms of the written contract, however.  Rather, according to Van Dam, the parties agreed that Allstate could dispose of its waste at Casella's dump sites in exchange for its post June 1st

17

receivables. Referring to a discussion with Farley and Romano about the carrying costs of

Allstate's business pending the closing, Van Dam explained the agreement as follows:

> We had that [discussion], I believe we had that with both Mr. Farley and Mr.
> Romano, that we would, that we would forgive effectively forgive the
> disposal expense in exchange for us [Casella] taking all of the revenue from
> June 1 through the closing date, and we would pay the disposal, so we
> would effectively take the margin on that net sale and that they would be
> responsible for their own operating cost, payroll, fuel, and truck cost.

Although Allstate was unable to pay its dumping fees in late May and early June, and

Casella had entered into a written disposal agreement with it that was unworkable, Van

Dam, in testifying about Allstate's solvency at the beginning of June, opined that Casella

assumed that "they [Farley and Romano] had something, you know, either personally, you

know, we can't tell what they're taking out of the business or what they have for personal

assets, they would remain solvent through the sale." In other words, Casella expected

Allstate to continue operations and fund its payroll and other expenses with cash infusions

from Farley or Romano. At that point, though, Romano and Farley was more concerned

about recouping their respective investments in Allstate than in making any further cash

infusions.

Thus, if Farley and Romano had resources, they were not prepared to invest

sufficient funds in Allstate prior to the June 26, 2003 closing to permit it to operate without

the accounts receivable it had agreed to sell to Casella. Romano, who had always been

primarily responsible for collecting the accounts receivable, either directly from customers

or at Allstate's post office box, continued to collect the receivables up to and after the June

26, 2003 closing. When asked how he intended to pay his expenses from June 1, 2003 until

18

the closing, he testified:

> Date of closing? Well, we got paid from everybody monthly, from people we
> sent bills to. How do we keep it going from the beginning? The same way.
> You - - you generate a bill, hopefully somebody pays you, or we go pick up
> the check, we put it in the account, we pay the bills, which pays the payroll,
> which pays the - - the dumps and everything else.

<div align="center">***</div>

> As long as we owned the business, I figured we could use the money that we
> . . . earned. We didn't steal it, we earned it.

He also testified that he was not told that he could not continue to collect the receivables.

He stated:

> . . . [H]ow to you expect me to run a company with no money? They
> [Casella] knew we had no money. I had no money. These guys got to work.
> Trash has got to get picked up. In the waste business if you miss one pick-
> up, people will get another company tomorrow; and if you don't have the
> customers, you don't have nothing to sell.

Romano further testified that his lawyer explained the terms of the Asset Purchase

and Assignment Agreement to him at the closing. Thus, he was aware that the effective

date of the Asset Purchase and Assignment Agreement was June 1ˢᵗ and that Casella was

paying Allstate in excess of $111,039.77 minus a $25,000 hold back for those receivables.

At the closing, Romano remained silent about his collection and use of the accounts

receivable generated by Allstate. He could have, but did not, acknowledge that he was

forced to collect and use the receivables to live up to the covenant to operate Allstate until

the day of the closing. Rather than risk an adjustment to the purchase price to account for

his use of the receivables, he elected to remain silent. Thus, Casella paid Allstate $86,039.77

for the receivables at the closing, excluding the $25,000 reserve.

<div align="center">19</div>

Following the closing, Romano's conduct evidenced his intention to use the proceeds from the sale to satisfy a mortgage on his home which he had obtained from the Institution for Savings in the amount of $84,185.39, as well as to satisfy debts of creditors to whom he had given his personal guaranty - - debts which were not assumed by Casella under the Agreement. Additionally, Farley obtained $46,000 from the sale proceeds, and Matt Evangelista was paid $7,900 from the sale proceeds as well. Although Allstate owed monies to unsecured creditors, Romano justified his actions by stating "I gave my blood, sweat, and tears to Allstate. I was Allstate. Nobody else was." He also stated: "All I want to do is support my family, and whatever I had to do to support my family, I'll do it."

After the June 26, 2003 closing, Van Dam learned from collectors employed by Casella who were contacting Allstate's former customers that those customers were representing that they had paid open invoices with respect to accounts receivable purchased by Casella. Accordingly, Van Dam repeatedly tried to contact Romano, who was to have commenced work as an independent contractor under the Consultation Agreement immediately following the June 26, 2003 closing. According to Van Dam, Romano did not report for work for several weeks after the closing. Van Dam testified that "Romano eventually called Mr. Volpe to tell him that he would no longer talk to me, that I was being too much of a pest and that I was bothering him both on his cell phone and at his home phone and that if I didn't cut it out, he wouldn't come into work at all." According to Van Dam, Volpe was able to calm Romano down, and Romano eventually agreed to meet with Van Dam.

20

When Romano reported to Casella's Peabody, Massachusetts office, Van Dam indicated that he and Romano immediately went to the Danvers Savings Bank as Van Dam was eager to obtain bank statements, copies of checks, deposit slips and copies of the back-up checks for the deposits. Farley had informed Van Dam that only Romano had access to Allstate's post office box because he had given his key to Romano at the closing. Van Dam told Romano about the problem with the receivables, explaining to him that Casella had paid for the receivables that appeared on the June 18th list. Van Dam testified that Romano called Farley from the bank and, to the extent he could hear the conversation, Farley "was making clear that it was in fact our money and that he needed to give it back to us." Denying that it was his understanding that the accounts receivable were sold effective June 1, 2003, Romano testified that he willingly accompanied Van Dam to the Danvers Savings Bank to obtain Allstate's bank records.

Casella introduced into evidence records from the Danvers Savings Bank in the name of "Phillip A. Romano d/b/a Allstate Carting." The statement for June 30, 2003 showed deposits and other credits, namely insufficient funds checks, totaling $70,933.72 and debits of $74,205.52. The bank statement dated July 31, 2003 showed deposits and other credits, totaling $20,975.59 and debits of $23,328.31. Thus, in the two month period ending on July 31, 2003, excluding credits for insufficient funds checks, Romano deposited a total of $81,754.80 into the account at Danvers Savings Bank. From the amount deposited, Romano made substantial payments to Dianne Romano and Matt Evangelista, paid personal expenses, and wrote checks to cash. Notably, Romano and Evangelista

21

worked together at Liberty Demolition following the closing. Although Romano testified that he was reimbursing Evangelista for services performed for Allstate, Romano neither submitted any invoices from Evangelista nor proffered his testimony in support of his own version of events. Moreover, the Court infers from Romano's decision to go into business with Evangelista that the payments were in anticipation of their business endeavor, not payments for past services.

Van Dam testified that by comparing the accounts receivable aging created on June 18th in Holliston with the bank statements obtained from the Danvers Savings Bank, together with deposit tickets and copies of checks that were actually deposited, he was able to determine the number and amount of accounts receivable purchased by Casella that had been paid to Romano by Allstate's customers and subsequently used by him. Van Dam created a list in two parts, one relating to customers that were moved to Casella's Peabody, Massachusetts division, and the other relating to customer serviced by its Salem, New Hampshire operation. Van Dam determined that Allstate had collected $63,305.77 prior to June 1st which it had not recorded in the June 18th accounts receivable aging and that it had collected $41,797.96 after June 1st for a total of $121,201.98, less the $25,000 hold back, or $96,201.98. Van Dam, noting that Casella had paid $111,039.77, less the $25,000 hold back, or $86,039.77, for Allstate's receivables, determined that the difference between what Allstate collected and what Casella agreed to pay was $10,162.21. Adding $10,162,21 to Casella's payment of $86,039.77, Van Dam determined that Romano obtained $96,201.98 of its receivables to which he added $11,113.55 for so-called "footing" or mathematical

22

errors for total damages relating to the accounts receivable of $107,315.53.

Van Dam also testified that Allstate left trash in its yard and containers which Casella was required to dump at an additional unanticipated cost associated with the Asset Purchase and Assignment Agreement of $11,282.37.

## III. DISCUSSION

### A. Section 523(a)(2)(A)

Casella relies upon 11 U.S.C. § 523(a)(2)(A), which excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). According to the United States Bankruptcy Appellate Panel for the First Circuit in <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803 (B.A.P. 1st Cir. 2005),

> In order to establish that a debt is nondischargeable under this section, a creditor must prove actual fraud, rather than mere fraud implied in law. *See* Lawrence P. King, 3 Collier on Bankruptcy ¶ 523.08[1] (15th ed. rev.2002). The elements of actual fraud include:
>
>> (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;
>>
>> (2) the debtor intended to deceive;
>>
>> (3) the debtor intended to induce the creditor to rely upon the false statement;
>>
>> (4) the creditor actually relied upon the misrepresentation;
>>
>> (5) the creditor's reliance was justifiable; and

23

(6) the reliance upon the false statement caused damage.

Aoki, 323 B.R. at 814 (citing McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir.2001), and Palmacci v. Umpierrez, 121 F.3d 782, 786 (1st Cir. 1997)).  According to the court, "[t]he first two elements of the Palmacci test describe the conduct and scienter required to show the debtor's fraudulent conduct generally . . . [while] . . . [t]he last four elements embody the requirement that the creditor's claim must arise as a direct result of the debtor's fraud." Id. (citing Spigel, 260 F.3d at 32).  All six elements must be established by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279, 291 (1991).

Neither Casella nor the Debtor addressed a preliminary issue relating to Casella's business relationship with Allstate, namely the consequences of the well-recognized principal of corporate law that officers, directors and shareholders of corporations ordinarily are shielded from the debts of the corporation.  In other words, Casella agreed to acquire accounts receivable that belonged to Allstate, not Romano, and it executed an Asset Purchase and Assignment  Agreement with Allstate, not Romano, individually, to acquire those receivables.  Accordingly, as a predicate to its assertion that Romano is personally liable to it for damages it suffered as a result of its purchase of phantom receivables, it was required to show that Romano was an alter ego of the corporation and that piercing Allstate's corporate veil is appropriate in this case. See Aoki, 323 B.R. at 811 (citing, inter alia, Berger v. H.P. Hood, Inc., 462 Mass. 652, 624 N.E.2d 947, 950 (1993)(a court may disregard the corporate form to defeat fraud or remedy an injury), and Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 15 (1st Cir.1985)("shareholders may

24

be held liable where they control the operation of the corporation and run it for their personal benefit, and where justice requires that the separate existence of the corporation be ignored."). In <u>Checkers, Inc.</u>, the United States Court of Appeals for the First Circuit referenced a list of factors for determining when a court is justified in piercing the corporate veil, "including insufficient capitalization for purposes of the corporate undertaking, nonobservance of corporate formalities, nonpayment of dividends, insolvency of the corporation at the time of the litigated transaction, siphoning of corporate funds by the dominant shareholders, nonfunctioning of officers and directors other than the shareholders, absence of corporate records, use of the corporation for transactions of the dominant shareholders, and use of the corporation in promoting fraud." 754 F.2d at 16.

The Court finds that the evidence submitted at trial compels the conclusion that Romano was the alter ego of Allstate. The record is replete with evidence that Allstate was, if not insolvent, within the zone of insolvency; that Romano siphoned corporate assets for his personal benefit; and that he used the corporate bank account as his own. Indeed, Romano all but admitted that he was the alter ego of Allstate, when he testified " I was Allstate."

Turning to the elements of fraud which Casella must prove, Farley and Romano brought a list of receivables and a box of invoices to Van Dam in Holliston, from which they prepared the June 18th aging summary that formed the basis for Casella's $111,039.77 offer to buy Allstate's accounts receivable. The evidence established that Farley had

Allstate's customer list on his computer and that the invoices issued by Allstate were relatively accurate. From that list, which contained the names of approximately 150 customers, the parties determined which invoices were outstanding and which had been paid. Romano contributed to the endeavor by indicating, based upon his memory, whether the invoices had been paid. His input was critical because of his practice of collecting the receivables either directly from customers or from the post office and depositing them, without necessarily reporting the payments in a systematic fashion to Farley. Following the closing, Van Dam ascertained that approximately one-third of the accounts receivable on the June 18th list, which Casella purchased, had been paid before June 1, 2003.

The next issue that the Court must determine is whether and when Romano misrepresented the value of the accounts receivable Allstate was selling to Casella. The Court finds that the operative date for any misrepresentation was June 26, 2003, the date of the closing, when Romano executed the Asset Purchase and Sale Agreement and obtained $86,039.77 in proceeds for the accounts receivable. Even if Romano may have been unaware of the significance of the June 18th accounts receivable aging at the meeting in Holliston, or had questions about its accuracy, the importance of the document Farley and Romano produced formed the basis for Casella's decision to forward the sum of $86,039.77 to Attorney Janos at the June 26th closing. On that date, Romano failed to inform Casella that many of Allstate's customers already had paid him for services. Thus, any inaccuracy with respect to the accounts receivable aging attributable to mathematical errors or bookkeeping errors was overshadowed by Romano's knowledge that the accounts

26

receivable aging was inaccurate because he had been collecting the receivables and using them to fund operations and pay his personal expenses _and_ because by that time his attorney had explained the terms of the Asset Purchase and Assignment Agreement to him.

A debtor's silence and failure to disclose a material fact may constitute a misrepresentation actionable under section 523(a)(2)(A)." Drake Capital Securities v. Larkin (In re Larkin), 189 B.R. 234, 239 (Bankr. D. Mass. 1995)(citing In re Van Horne, 823 F.2d 1285, 1288 (8th Cir. 1987)). _See also_ The Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999). Romano had a duty to disclose that the value of the accounts receivable was substantially diminished as a result of his conduct in collecting them, and his silence at the closing constitutes an actionable misrepresentation. In view of that conduct, the Court finds that Romano, at the June 26th closing, made a false representation to Casella about the value of Allstate's receivables with the intention of deceiving it and with the intention of inducing it to rely upon his misrepresentation. His conduct in obtaining sale proceeds to satisfy his personal obligations ahead of the unsecured creditors of Allstate, coupled with his payments to Evangelista, his future business partner, establish the element of scienter pertinent to his fraudulent conduct.

The Court also finds that Casella justifiably relied upon Allstate's June 18th listing and was damaged as a result of its payment. "The burden on the creditor [to show justifiable reliance] is relatively low . . . [and] . . . the creditor need not prove that he acted consistent with ordinary prudence and care." Aoki, 323 B.R. 816 (citing Sanford Inst. for Sav. v. Gallo, 156 F.3d 71, 75 (1st Cir.1998)). _See also_ Field v. Mans, 516 U.S. 59, 70-71

(1995).

Van Dam was frustrated in obtaining satisfactory information about Allstate's accounts receivable and his reliance at the June 18th meeting in Holliston upon Romano's memory of who had paid him was questionable. Nevertheless, the discrepancy between Farley's May 1, 2003 accounts receivable aging and the June 18th document was only $15,422.15, and Van Dam protected Casella by obtaining back up information for the June 18th aging and establishing a $25,000 hold back. Most importantly, though, Romano had executed a Consultation Agreement pursuant to which Casella agreed to generously compensate him at the rate of $8,000 per month and to provide him with a vehicle allowance and health insurance. Thus, Casella justifiably relied upon Romano's representation of the value of the receivables as of June 1st because of the contractual relationship it had established with him apart from his role in executing the Asset Purchase and Assignment Agreement. Because Romano had collected those receivables, he knew that the payment being made by Casella for the Allstate's accounts receivable was grossly inflated, and he said nothing, electing to scoop the benefit of the payment in order to satisfy obligations he personally guaranteed in addition to Allstate's secured debt. Accordingly, Casella is entitled to judgment under 11 U.S.C. § 523(a)(2)(A) in the amount of $96,201.98.

The Court rejects Casella's additional claim in the amount of $11,113.55 for so-called footing errors. The $25,000 hold back was to be used to address those errors, and Casella never paid the $25,000 to Allstate. Accordingly, it was not damaged by footing errors it discovered after the closing.

Romano relies upon the integration clause in the Asset Purchase and Assignment Agreement in an attempt to avoid liability. The Court rejects Romano's argument. Although the Asset Purchase and Assignment Agreement did not specify which accounts receivables were purchased or how the post-June 1st receivables would be handled, Casella fully performed under both the Asset Purchase and Assignment Agreement and the parties' oral understandings about the post-June 1st dumping expenses. By accepting payment for the receivables, Allstate and Romano waived any argument that Casella is not entitled to damages relating to those receivables based upon the integration clause in the parties' written agreement.

Romano's testimony about the use of the receivables was contrived to reflect ignorance of ordinary business practices. His testimony was both inconsistent with his testimony in the earlier adversary proceeding commenced by Farley and incredible. Romano knew Casella was buying Allstate's receivables, and he knew that there would have to be a form of payment for Allstate's use of Casella's dump sites after June 1, 2003. His plea of ignorance was belied by his use of the sales proceeds to compensate himself and reward Evangelista. The integration clause cannot shield his fraud.

B. Section 523(a)(6)

Section 523(a)(6) provides in relevant part the following:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . .

29

11 U.S.C. § 523(a). To sustain its burden of proof under the preponderance of the evidence standard, a creditor must establish "that 1) the debtor's conduct was willful and malicious, 2) the creditor suffered an injury to its legal rights, and 3) the creditor's loss was caused by the debtor's conduct. *See* <u>CMEA Title Agency, Inc. v. Little (In re Little)</u>, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005)(citing, *inter alia*, <u>Jones v. Svreck (In re Jones)</u>, 300 B.R. 133, 139 (B.A.P. 1st Cir. 2003)). *See also* <u>Beland v Cunningham (In re Cunningham)</u>, 365 B.R. 352, 359-60 (Bankr. D. Mass. 2007). "Although relevant state laws may be instructive, 'what constitutes 'willful and malicious injury' under § 523(a)(6) is a matter of federal law.'" <u>Little</u>, 335 B.R. at 383 (citing <u>Baldwin v. Kilpatrick (In re Baldwin)</u>, 249 F.3d 912, 917 (9th Cir. 2001), and <u>Kleman v. Taylor (In re Taylor)</u>, 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004)). For a debt to be excepted from discharge as a result of a willful or malicious injury requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998). "The word 'willful' in [§ 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." <u>Id.</u>

According to the Court in <u>Little</u>,

> When determining whether the debtor's conduct was willful, "[i]n addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action." <u>In re Sicroff</u>, 401 F.3d 1101, 1106 (9th Cir.2005) (quoting <u>In re Su</u>, 290 F.3d 1140, 1146 n. 6 (9th Cir.2002)); <u>In re Wood</u>, 309 B.R. 745, 753 (Bankr. W.D. Tenn.2004) ("To find that a debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act, it is necessary to look into the debtor's mind, subjectively.").

335 B.R. at 383.  The bankruptcy court added:

> The term malicious is defined as conduct taken in conscious disregard of
> one's duties or without just cause or excuse. <u>Wheeler v. Laudani</u>, 783 F.2d
> 610, 615 (6th Cir.1986) (quoting <u>Tinker v. Colwell</u>, 193 U.S. 473, 486, 24 S.Ct.
> 505, 48 L.Ed. 754 (1904)). An injury has been defined as malicious under §
> 523(a)(6), when it is: "(1) a wrongful act, (2) done intentionally, (3) which
> necessarily causes injury, and (4) is done without just cause or excuse." <u>In re</u>
> <u>Sicroff</u>, 401 F.3d at 1106 (citation omitted). "[T]he definition of malice
> requires a heightened level of culpability transcending mere willfulness." <u>In</u>
> <u>re Martin</u>, 321 B.R. at 442. Mere "knowledge that legal rights are being
> violated is insufficient to establish malice . . . ." <u>In re Best</u>, 109 Fed.Appx. at
> 6 (quoting <u>In re Mulder</u>, 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004)). This does
> not, however, require the debtor's condut to be driven by a personal hatred
> directed at the creditor. <u>In re Jones</u>, 300 B.R. at 140 (citing <u>Printy v. Dean</u>
> <u>Witter Reynolds, Inc.</u>, 110 F.3d 853, 859 (1st Cir.1997)) ("'No special malice
> toward the creditor need be shown,' as malice can be present 'even in the
> absence of personal hatred, spite or ill-will.' "); <u>In re Thiara</u>, 285 B.R. 420, 434
> (9th Cir. BAP 2002); <u>In re Fors</u>, 259 B.R. 131, 137 (8th Cir. BAP 2001).

<u>Little</u>, 335 B.R. 383-84.

Measured by these standards, the Court finds, as an alternative basis for an
exception to discharge, that Romano willfully and maliciously converted accounts
receivable purchased by Casella which he collected after the June 26th closing. "Under
Massachusetts law, a defendant is liable for conversion where he 'intentionally or
wrongfully exercise[d] acts of ownership, control or dominion over personal property to
which he has no right of possession at the time." <u>Braunstein v. Panagiotou (In re McCabe)</u>,
345 B.R. 1, 8 (D. Mass. 2006).  After the June 26th closing, Romano had no right to any of the
receivables that had once belonged to Allstate and his collection of receivables after that
date was a willful and malicious injury to Casella's property.

The Asset Purchase and Assignment Agreement was not a masterpiece of

31

draftsmanship. The parties' agreement to value the assets as of June 1, 2003 with a closing

almost four weeks later invited problems. Until the closing, Casella did not actually own

the receivables so Romano's use of them, arguably, could be viewed as justified, if he

intended to keep Allstate operational until the closing, and if he had advised Casella that

he, in fact, had used the receivables for that purpose. Romano testified that it was

necessary for him to continue to operate Allstate until the closing because of risk that

customers would engage other waste disposal companies, thereby justifying his use of the

accounts receivable. After the closing, however, his continued collection of the receivables

was without justification or excuse and was willful and malicious within the meaning of

section 523(a)(6). Any checks or cash that Romano collected and failed to turn over to

Casella after June 26, 2003 proximately caused injury to Casella, who had paid $86,039.77

for the pre-June 1, 2003 accounts receivable and had intended to invoice Allstate's

customers directly for services performed after June 1, 2003 pursuant to the parties'

agreement to permit Allstate to use its dump sites. Because Attorney Janos had advised

Romano of the terms of the Asset Purchase and Assignment Agreement, Romano simply

cannot plead ignorance to Casella's ownership of the receivables after June 26, 2003.

Collecting them after that date was both willful and malicious.

In the exhibit submitted by Casella setting forth its damage claim, Casella did not

break down its claim in a manner that would permit this Court to determine the value of

accounts receivable that Romano actually obtained after the closing. Nevertheless, the

statements from Danvers Saving Bank show that Romano deposited $21,417.97 between

June 30, 2003 and July 21, 2003.  The number of deposits (12) and the random amounts of the deposits support the inference that the sums deposited were accounts receivable generated by Allstate.  Because Romano was unemployed, his only source of income was Casella's receivables.  Thus, the Court finds that at a minimum Romano converted accounts receivable of $21,417.97.

C. Sections 523(a)(2)(B) and (a)(4)

Because the Court has determined that Romano's debt to Casella is nondischargeable under section 523(a)(2)(A) in the sum of $96,201.98, and, alternatively, nondischargeable in the sum of $21,417.97 under section 523(a)(6), the Court need not address the remaining counts of Casella's Complaint, including its count under Mass. Gen. Laws ch. 93A.[5]

D. Damages Associated with Casella's Disposal of Allstate Waste

The Court finds that Casella failed to establish that its costs in disposing of waste either left by Allstate in its yards or at customer locations amounted to more than breach of contract.  The Asset Purchase and Assignment Agreement granted Casella the right to inspect the tangible acquired assets within five business days of the closing.  There was no

---

[5] For purposes of section 523(a)(2)(B), the Court observes, however, that there was no evidence that Casella relied upon the balance sheets prepared by Farley for calendar years 2002 and 2003 for purposes of valuing Allstate's accounts receivable. Moreover, the June 18th accounts receivable aging prepared by Farley and Romano in Holliston, without more, was not "a statement respecting the debtor's financial condition.  *See* Hopper v. Everett (In re Everett), 364 B.R. 711, 720 (Bankr. D. Ariz. 2007); *see also* Zimmerman v. Soderlund (In re Soderlund), 197 B.R. 742, 745 (Bankr. D. Mass. 1996).

33

evidence that it elected to inspect the various trash containers at Allstate's yard, and there

was no evidence that Romano specifically represented that there would be no trash in any

of the containers, compactors, boxes or trucks Allstate was selling.  Accordingly, the

$11,282.37 expense incurred by Casella for trash disposal is not excepted from discharge

and is an unsecured claim in Romano's bankruptcy estate.

## IV. CONCLUSION

In accordance with the foregoing, the Court shall enter a judgment in favor of

Casella and against Romano.

By the Court,

*Joan N. Feeney*

_____

Joan N. Feeney
United States Bankruptcy Judge

Dated: April 3, 2008
cc: Mark W. Griffin, Esq., Carlo Cellai, Esq., Kathleen P. Dwyer, Esq.